IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | No. 13-176-1 |
| ERIC SIJOHN BROWN : | |

## MEMORANDUM

**Schiller, J.**                                                                                                           **September 29, 2020**

Before the Court is Defendant Eric Brown's motion for compassionate release. For the reasons that follow, the motion is granted.

## I.   FACTUAL BACKGROUND

Between 2004 and 2009, Brown played a central role in a sophisticated mortgage-fraud conspiracy that resulted in millions of dollars in losses to various lenders. Brown was the organizing force behind the scheme and recruited a number of women from his past to participate. Brown ultimately took responsibility for his conduct and pled guilty to a variety of charges stemming from the scheme. On October 28, 2014, this Court sentenced Brown to 180 months of imprisonment, to be followed by a five-year term of supervised release. Currently, Brown's anticipated release date is November 9, 2027.

Brown is serving his sentence at FCI Fort Dix. His records indicate, and the Government concedes, that Brown suffers from the following ailments: atherosclerosis (10-year risk of heart disease or stroke is 12.4%, ECG on August 21, 2020 marked "abnormal", possible left ventricular hypertrophy or ischemia), asthma, sleep apnea, prediabetes, and obesity. Further, Brown's records confirm that he suffers from chronic kidney disease and hypertension, but the Government contests the current severity of those conditions. Based on these medical conditions, and in light of the coronavirus pandemic, Brown asks this Court to reduce his sentence to time served. Brown

1

requested that the BOP bring a motion for compassionate release on his behalf on June 27, 2020, and the warden denied his request on July 20, 2020. He filed the instant motion on July 29, 2020. The Government filed its initial opposition to Brown's motion on August 3, 2020. Brown then filed a reply to the Government's response. On September 8, 2020, the Government filed a supplemental letter to the Court correcting its previous position regarding the severity of Brown's heart condition. For the reasons that follow, the Court will grant the motion for compassionate release.

## II. DISCUSSION

### A. Compassionate Release Statute

Under 18 U.S.C. § 3582(C)(1)(A)(i), a judge may reduce an inmate's sentence if four conditions are met. First, the inmate must satisfy an administrative exhaustion requirement. It is uncontested that Brown has satisfied the exhaustion requirement. Second, the Court must find that "extraordinary and compelling reasons warrant such a reduction." Third, any reduction granted by the Court must be "consistent with any applicable policy statements issued by the Sentencing Commission". And finally, the proposed reduction must be consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a).

While Congress has not defined "extraordinary and compelling," the Sentencing Commission has issued a policy statement with helpful guidance.[1] Pursuant to that statement, extraordinary and compelling reasons for modification of sentence exist where, "[t]he defendant is suffering from a terminal illness . . . [or] suffering from a serious physical or medical condition . . . that substantially

---

[1] This Court has repeatedly rejected the Government's argument that the policy statement is binding on the Court, and will continue to follow the conclusion reached by the majority of courts that have considered the issue. *See e.g.*, *United States v. Rodriquez*, Crim. A. No. 03-271, -- F. Supp. 3d --, 2020 WL 1627331. At *1 (E.D. Pa. Apr. 1, 2020). The Court retains the discretion to independently assess whether a defendant has presented extraordinary and compelling reasons beyond those contained in an outdated policy statement.

diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.'" U.S.S.G. § 1B1.13 cmt n.1(A). "The government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19" qualifies as having extraordinary and compelling reasons for compassionate release under note 1(A). (Gov't Resp. in Opp'n to Def.'s Mot. to Reduce Sentence ["Gov't's Opp'n"] at 17.) Courts generally require proof of such a medical condition and "more than mere speculative risk of exposure to the virus at the prison where the inmate is housed", to meet the extraordinary and compelling test. *United States v. Phillips*, Crim. A. No. 09-718, 2020 WL 5076753 at *3 (E.D. Pa. Aug. 27, 2020).

If an extraordinary and compelling reason for immediate release exists, the Court must decide whether release is appropriate in light of the § 3553(a) factors. The relevant factors the Court must consider include the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, promote respect for law, provide just punishment, provide adequate deterrence, protect the public from further crimes, and provide the defendant with needed correctional treatment in the most effective manner; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(1-2,6).

### B. The Pandemic and the Situation at Fort Dix

The Court will not write at length about the havoc wreaked by COVID-19 in the United States. The virus, coupled with the abysmal response to it throughout much of this country, has led to the death of over 200,000 people (and counting) in the United States. While the virus can be dangerous for anyone, people with certain underlying medical conditions and older adults are at increased risk of severe illness or death from COVID-19. *People Who Are At Increased Risk for*

*Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Sept. 16, 2020). Prisons have been hit particularly hard by the pandemic, as they present numerous environmental factors favorable to the spread of the virus. *See United States v. Rodriguez*, Crim. A. No. 03-271, 2020 WL 1627331, at *1, 8-9 (E.D. Pa. Apr. 1, 2020) ("Prisons are tinderboxes for infectious disease.").

Brown notes that "Fort Dix is a facility where a notable outbreak has occurred[.]" (Def.'s Reply to Gov't's Resp. to Def.'s Mot. to Reduce Sentence [("Def.'s Reply")] at 3.). According to the Government, "[t]he situation at FCI Fort Dix remains under control at [the time of] this writing." (Gov't's Supplemental Letter, ECF Document No. 392 ["Supplemental Letter"] at n.3). Brown, however, contends that exposure to the virus is "provably unpreventable at FCI Fort Dix", which was the subject of a class-action lawsuit on behalf of medically vulnerable inmates, which asserted that 58 inmates at FCI Fort Dix had tested positive for COVID-19 in May 2020.[2] (Def.'s Reply at 2.) The Government admits that there have been at least 37 inmates infected at Fort Dix, but contends there are no currently infected inmates. (Supplemental Letter at n.3.) However, the large population at Fort Dix, along with the lack of testing at the facility, may fail to accurately portray the crisis at the prison. Supposedly, the Government argues, because Fort Dix has not seen a spike in confirmed cases, it can be assumed that the preventative measures at the prison have been effective. (*Id.*) Perhaps there are relatively few cases of the virus at FCI Fort Dix. But the Court does not subscribe to the Government's line of thinking. It suggests that ignorance is the best policy: Fort Dix only needs to be concerned when test-confirmed cases increase but need not test widely. That strikes the Court as a risky deal-with-it-only-if-forced-to strategy. A successful strategy for

---

[2] *See Wragg v. Ortiz*, Civ. A. No. 20-5496, --F. Supp. 3d--, 2020 WL 2745247 at *5, 19 (D.N.J. May 27, 2020) (declining to expand habeas jurisdiction where "Petitioners have other avenues available for immediate relief", *i.e.,* requests for home confinement or compassionate release.).

dealing with the virus in prisons is to prevent the deadly scourge from infecting individuals, and one cannot know the full extent of the problem if most of the individuals at FCI Fort Dix remain untested.

In fact, the Court is somewhat skeptical of the Government's confidence in BOP containment efforts. The BOP did not institute a policy requiring staff to wear face masks until August 27, 2020, and even that guidance contemplates religious exemptions, medical exemptions, and outright refusals to comply with the mask mandate. *See* Fed. Bur. Of Prisons Memo for Chief Executive Officers, Mandatory Use of Face Covering For BOP Staff (Aug. 24, 2020), *available at* https://www.bop.gov/foia/docs//Mandatory_Use_Face_Coverings_for_Staff_08242020.pdf. Further, BOP employees are permitted to continue working after potential exposure to COVID-19. *See* Fed. Bur. Of Prisons, COVID-19 Pandemic Response Plan, BOP Employee Management (Sept. 11, 2020), *available at* https://www.bop.gov/foia/docs//Mod_11_Employee_Management_of_COVID_Pandemic_Response_Plan_08312020.pdf (defining "potential exposure" as "[h]aving close contact within 6 feet of an individual with confirmed or suspected COVID-19 for greater than 15 minutes while not wearing recommended PPE [(personal protective equipment)].").

It is true that the CDC advises that critical infrastructure workers may be permitted to continue work following potential exposure to COVID-19, provided they remain asymptomatic and additional precautions are implemented to protect them and the community. *Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19*, CDC, updated Sept. 11, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html (last visited Sept. 24, 2020). However, the CDC also recommends testing for all

5

close contacts of a person infected with COVID-19, and cautions that symptom screening cannot identify individuals with COVID-19 who may be asymptomatic or pre-symptomatic. *Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities*, CDC, updated Aug. 10, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last visited Sept. 24, 2020). In light of the history of confirmed cases of COVID-19 at FCI Fort Dix, and the BOP's protocols which do not include mass-testing of inmates or any testing of staff, the Court finds there is more than a mere speculative risk of infection at Fort Dix.

### C. Extraordinary and Compelling Reasons

The Government acknowledges that Brown suffers from numerous conditions that the CDC recognizes as putting a person at increased risk of serious illness or death if infected with COVID-19.[3] Nonetheless, the Government has repeatedly asserted that Brown's medical conditions are under control at Fort Dix and he is therefore not entitled to relief. (Gov't's Opp'n at 1, 5-7, 21-22.) Indeed, in an attempt to downplay the severity of Brown's conditions, namely obesity and chronic kidney disease, the Government provided some helpful tips to persons such as Brown, including: live a healthy lifestyle, eat plenty of fruits and vegetables, exercise 30 minutes per day five days per week. (*Id*. at 6, n.1, and 20.) It then went on to describe how BOP has "severely limited the movement of inmates and detainees" and "requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease." (*Id*. at 9.) Even if it were expected that Brown could resolve his obesity at some point in

---

[3] "The CDC recognizes that the following underlying medical conditions place individuals at a greater risk of severe illness from COVID-19: cancer, chronic kidney disease; chronic obstructive pulmonary disease; an immunosuppressed state as a result of an organ transplant; obesity (body mass index "BMI" of 30 or higher); serious heart conditions; sickle cell disease; and type II diabetes." *Phillips*, 2020 WL 5076753 at *3.

the future through use of the Government's suggested healthy lifestyle tips, he could not possibly recover quickly enough to protect himself from the immediate threat of COVID-19 in his prison facility and the severe or fatal consequences that he could suffer because of his obesity if he contracts the virus. Additionally, courts have determined that chronic kidney disease can present an "extraordinary and compelling" reason for compassionate release. *See, e.g.*, *United States v. Davidson*, Crim. A. No. 16-139, 2020 WL 4877255, at *19-20 (W.D. Pa. Aug. 20, 2020); *see also United States v. Iezzi*, Crim. A. No. 17-157, 2020 WL 4726582, at *8 (W.D. Pa. Aug. 14, 2020). And, "Courts have granted compassionate release to incarcerated individuals with obesity and sleep apnea because those conditions place them at high risk for serious complications due to COVID-19." *United States v. Delgado*, Crim. A. No. 18-17, 2020 WL 2464685, at *4 (D. Conn. Apr. 30, 2020) (citing cases). Further, the Government's Supplemental Letter amended its initial assessment of Brown's atherosclerosis to reflect that Brown now requires medication to prevent heart disease and stroke, and he may suffer from left ventricular hypertrophy or ischemia. Whether or not the Government agrees that this is the kind of "serious heart condition" identified by the CDC as increasing a person's chance of serious illness or death, it agrees that Brown's heart condition "certainly warrants continued attention." (Supplemental Letter at 2.)

    The Court is not merely concerned with the ability of Fort Dix to treat or control Brown's underlying conditions. The confirmed presence of COVID-19 at Fort Dix, despite the BOP's procedures to prevent transmission, underscores the ongoing risk to inmates with Brown's medical conditions of contracting the virus and suffering severe illness or death as a result. "There currently are no cures, vaccines, or accepted treatments for COVID-19, and the only effective way to protect vulnerable people from injury or death from COVID-19 is to prevent individuals from being infected with the COVID-19 virus." *Pimentel-Estrada v. Barr*, Civ. A. No. 20-495, 2020 WL

2092430, at *3 (W.D. Wash. Apr. 28, 2020) (internal quotation marks omitted). The Government's recognition that Brown's obesity objectively constitutes "a serious physical or medical condition . . . that substantially diminishes [his] ability . . . to provide self-care" at Fort Dix, coupled with his other serious medical conditions (including asthma, sleep apnea, atherosclerosis, chronic kidney disease, and prediabetes) and the confirmed presence of the virus at Fort Dix, leads the Court to conclude that extraordinary and compelling reasons justify Brown's immediate release from incarceration.

        **D.**      **Consistency with Sentencing Considerations**

Although Brown has demonstrated an "extraordinary and compelling" reason for his compassionate release exists, the Court must decide whether release is appropriate in light of the § 3553(a) factors. Again, the relevant factors the Court must consider include the nature and circumstances of the offense; the defendant's history and characteristics; the kinds of sentences available; the need for the sentence to reflect the seriousness of the offense, promote respect for law, provide just punishment, provide adequate deterrence, protect the public from further crimes, and provide the defendant with needed correctional treatment in the most effective manner; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(1-3,6). This determination is left to the discretion of the district court. *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020).

The Court finds that, upon weighing the extraordinary and compelling reasons for Brown's reduction of sentence against the sentencing considerations set forth in Section 3553(a), he is entitled to compassionate release.

The Government contends that Brown is not entitled to compassionate release and "this Court should consider not just the fact that these conditions are well managed, but also the small

percentage of the sentence served, in light of the offense conduct and Brown's criminal history." (Gov't's Opp'n at 27.) Brown counters that he does not present a danger to the community, as his crime of conviction was non-violent and the criminal history to which the Government refers consists of a federal drug distribution case that occurred nearly 30 years ago. (Def.'s Reply at 3.) Brown contends that since his sentencing in this matter, he has "focused on bettering himself so that he may be a productive member of society upon reentry." (*Id.* at 4.) For instance, "he completed the class for his Commercial Driver's License (CDL), and Comparable Markets" and participated in the prison's welding safety program. (Def.'s Mot. to Reduce Sentence at 9.)

Without question, Brown's crimes were serious and they were not victimless, a fact that Brown realizes. Brown took advantage of numerous people and greatly harmed the community. He pled guilty to the serious crimes with which he was charged, and he has paid a price for his crimes. The Court does not believe, however, that Brown is presently a danger to the community. These crimes took place more than a decade ago, and while they had very real consequences, were not violent in nature. Moreover, Brown's most recent record in prison is without incident, and he is housed in a low-security facility. The Court is sympathetic to the anxiety and emotional distress that inevitably flows from the threat of COVID-19 in prison, especially to a person who is in high-risk categories for severe illness or death. Under such circumstances, the Court believes that the need for punitive measures and effective correctional treatment can be accomplished with a shorter period of incarceration. The Court finds that the time Brown has already served, in combination with the circumstances of his confinement and the modifications of the conditions of his supervised release (which will be discussed *infra*),  sufficiently reflect the seriousness of his crimes and provide adequate deterrence to future criminal conduct.

The kinds of sentences available is an even more significant factor to consider in the midst of a global pandemic. The Court will not "wait to decide Mr. Brown's request to prevent his untimely death until it is too late to actually do so." (Def.'s Reply at 5.) Under § 3582(c)(1)(A), the Court "may impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment[.]" Moreover, pursuant to 18 U.S.C. § 3583(e)(2) and (e)(4), the Court has the power to modify Brown's conditions of supervised release to "order the defendant to remain at his place of residence[.]" The Court has determined that Brown's rehabilitation will be best served by reducing his period of incarceration to the time he has already served and allowing him to return home to begin a period of supervised release. The Court will modify the term and conditions of Brown's supervised release as follows: upon his release from BOP custody, Brown will serve a one-year period of home confinement, to be followed by a four-year term of supervised release.

### III. CONCLUSION

For the foregoing reasons, Eric Brown's motion for compassion release under 18 U.S.C. § 3582(c)(1)(A)(i) is granted. His term and conditions of supervised release are modified as outlined herein. An Order consistent with this Memorandum will be docketed separately.